Please rise. I'm the owner of Appellate Court. First Division is now in session. Justice Hoffman presiding. Please sit. Okay. Ladies and gentlemen. We have only one case today. 15 minutes for the appellant. 15 minutes for the appellee. 5 minutes in rebuttal. I don't use the timing lights, but I'll hold you to the time. 0-9-5-0. Gary Eskew v. Burlington Northern and Santa Fe Railway. Good morning, Your Honor. Raymond Groble on behalf of BNSF Railway Company and METRA. Good police to court. Counsel. The verdict in this case was tainted by jurist conduct. It caused actual prejudice to BNSF and METRA. There was a continued online public discussion of this case throughout the trial, from jury selection until after the verdict. The juror's use of social media to publicize the inner workings of the jury during the trial is exactly the type of conduct that our Supreme Court prohibited by the recently amended IPI 1.01. And it's the type of conduct about which the Supreme Court expressed concern in the comments to that instruction. And we have pointed out numerous errors of law in the court below and believe that any one of those errors alone warrants a new trial. But the cumulative effect of these errors was overwhelming, requiring BNSF and METRA to try this case with their hands tied behind their back and deny both defendants a fair trial. If time allows, I'll try to address all of those issues, but I'm going to focus on what we believe are the two most egregious issues first. That is the juror's misconduct and the failure of the trial court to investigate that misconduct. And second, the trial court's determination that Mr. Eske was a passenger is a matter of law and owed the highest degree of care, which is contrary to the law when he was not boarding, riding, or lighting at the time of the accident. With respect to the juror's misconduct, the sanctity of the juror room was invaded by a juror who blagged about the case during trial. Name is Mrs. Bradshaw. Online, she's known as Mrs. Peavy. The new instruction 1.01 demonstrates the Supreme Court's concern with that issue. Comment 10 to that instruction highlights the court's prohibition on the use of electronic devices. And I quote, the use of web search engines, wireless handheld devices, and internet-connected multimedia smartphones by jurors in any given case has the potential to cause a mistrial. It is critical to the administration of justice that these electronic devices not play any role in the decision-making process of the jurors. And the court then cited a case in which a jury foreperson used a smartphone to look up the definitions of prudent imprudence, and that resulted in a mistrial. Let's get something straight. Only one juror did this, is this correct? That is correct. Okay. And there is no evidence in here that there was any extrinsic influence on the jury that you presented to the trial judge, did you? That is correct. Okay, so what we've got here is we've got a juror publishing on a blog that another juror said she virtually made up her mind, and she was told that she couldn't do that until the end of the trial. What else have you got? Well, Judge, I would refer the court first to the – first I'd like to talk about what a blog is. This is a website, but it's not a post-only website. It's an interactive website. And there are comments to the blog, starting from when this woman was selected as a juror. There are people responding to her. We don't have those comments, and we don't know what was said either on or offline. We understand that, but it's not extrinsic. It's not an extrinsic contact. So you had an obligation to present evidence to the trial judge of some form of prejudice. What did you present? Well, Judge, we presented the fact that Mrs. Peavy was discussing or Mrs. Bradshaw was discussing the case with her husband throughout the course of the trial, and she's discussing the cross-examination of the witnesses by Mr. D'Aretani. She's discussing the fact, the plaintiff's testimony, Mrs. Esky's testimony. Sympathy won't win their case, but it sure doesn't help. She's talking about cross-examination. The plaintiff's attorney, IMHO, in my humble opinion, ripped his testimony apart. The guy had a tail. It would have been between his legs if he stepped down from the stand. Then later, the Sunday before the final week of trial, she says, quote, We spent our time in the jury room trying but not succeeding to not talk about the case. One more thing. I tell Mr. Peavy things about the case, but I'm very careful not to give away any details that might let him know what the case is. She goes on to speculate about the settlement of the case. Here's what I think. A likely scenario is that the defendant originally tried to settle the case with the plaintiff, but the plaintiff and or her lawyers were not willing to settle for the amount the defendant offered. And she goes on to say, They're taking a chance that the jury will award less money than what the plaintiff's lawyers are holding out for. Hmm. We shall see. In that same post, she says, But I can tell you some stuff. At one point on Friday, in the privacy of the jury room, one of the jurors said, Well, all that's left now is deciding how much. And there are comments, not to that particular post, but prior posts, to her post on Let's be fair about what was actually said. After she said, I looked at her in disbelief. You can't talk that way, I said. You have to wait till all the evidence is in. And we've heard all of the witnesses. Did she say that in the post? She actually did, Your Honor. Okay. And then she says, Later, Another entry, Of course, it ain't over till it's over. The other jurors and I are guarding our objectivity fiercely until the last syllable of testimony has been uttered and the last molecule of evidence has been presented. She did say that. Well, isn't that what jurors are supposed to do? Now, they're not supposed to talk to each other, but the cases are pretty clear. Merely because they talk to each other doesn't mean you're entitled to a new trial. I asked you something before. Tell me where you presented evidence of prejudice. Well, Judge, what I would say is when it's clear that the jurors violated their oath, and here's what we know. We know that there was this continuing online public discussion of the case from the moment she was selected for jury duty. We know that people responded to that discussion with comments. We know that jurors discussed the case amongst themselves. We know that one juror made up her mind about liability before the conclusion of the evidence and announced it to the other jurors. We know that this particular juror discussed the case with her husband. So we know that, and I would suggest to the court. She told her husband things. We don't know what he said to her. That's correct. He didn't say anything. And the only reason we know about any of this, and it's not a new issue, the only reason we know any of this is because she used social media to publicize it. So she carried out this online public discussion during the course of the trial. So we do know that. I would suggest in that case that prejudice would be presumed and that what the trial. Oh, I don't know that prejudice is presumed. The Supreme Court doesn't say it's presumed. Well, the cases address extrinsic evidence or extrinsic information. Runge says that although premature jury deliberation is not necessarily proper, it's not as serious as the exertion of external influences on a jury, nor does every incident of juror misconduct require a new trial. What's critical is not that the jurors kept silent with each other about the case, but that each juror kept an open mind until the case had been submitted to the jury. And we have evidence here that at least one juror did not have an open mind until the case was submitted. I think we have a juror making a comment. And then we have another thing on the blog that says we all agreed to keep objectivity until the end of the case. Sure. I think you've got to show some form of prejudice. And that's what Runge says. Now, my question is, other than this one juror saying that the only thing we have to do is figure out how much, what have you got to establish prejudice? Well, Judge, I think that the online discussion alone, public discussion of the inner workings of the jury during the course of the trial is sufficient. We submitted to the court as additional authority this Georgetown Law Journal article, and it talked about jurors being held to the same standard as judges because they're considered part of the judicial system. They talk about using the appearance of impropriety standard. And I would suggest to the court that Runge is rejected. Runge rejects that. I mean, you're just not going anywhere with that. Runge rejects this appearance of impropriety and says there must be a showing of prejudice if there is no external influence. External influence raises a presumption. You have no presumption running in your favor in this case. But what I would suggest is in this circumstance what the trial court should have done is conducted an investigation into this because without that investigation, we know only what is in this online block.  We asked the court to conduct the investigation. It didn't. We could do no more at that point to show the prejudice. Counsel, why do you not have the comments? At the time we took the screenshot of the blog, we did not grab the comments. And I don't know. It may still be out there, but it's not part of the record. But what I would suggest is when the juror conducts a discussion such as this in public on the process of the trial, that at the very least the trial judge conduct an investigation to determine what prejudice was suffered. That investigation was not conducted. And I would suggest to the court that this should be reversed in a manner that grounds alone. But another extremely significant issue is the duty to bear instruction. Both PNSF and METRA were held to the highest degree of care in this case, despite the fact that METRA did not operate the train. The trial court instructed the jury that Mr. Askey was a passenger as a matter of law and owed the highest duty of care. This is an unwarranted and unprecedented expansion of common carrier liability as Mr. Askey was a pedestrian crossing the street and was not in the process of boarding, alighting, or riding the train. Under the rationale of the trial court, and as argued to the jury by plaintiff's counsel, Mr. Askey was owed the highest duty of care from the moment he left his house intending to board the train. And I quote, The duty extended before Scott ever stepped out that door on that faithful afternoon of January 22, 2004. That duty existed as the defendant before Scott ever reached that platform at that time. They had an unfettered, unconditional obligation to provide additional care. That's simply not... But that wasn't the highest duty of care argument, counsel. That was the argument saying that they owed him a greater duty of care because they knew he was blind. The highest duty of care argument is the question of whether, where was this man at the time he was ahead? Was he under your control? Was he on your platform in a position to board the train? Or was he just wandering around somewhere? Well, he was attempting to cross the tracks at a public crosswalk to get to the other side to board his train that typically came in on that side. And I think the Pence court described the limitations of that liability and noted that the purchase of the ticket alone does not make someone a passenger nor does intending to board. And Pence cited two longstanding Illinois Supreme Court cases in support of that proposition. The first one, I.C. v. Keith, noted that the passenger must come under the care of the carrier and be accepted for passage before the highest duty of care can arise. In this case, Mr. Eskew had not come under the care of either BNSF or Metro. And second, he cited Jennings, which found that anyone can walk on a public sidewalk. But where was he standing? Where was he standing vis-a-vis the closed gates at the time he was struck? He was standing what would be inside the closed gates. Inside the closed gates. And that portion of Grove Street is where passengers board the train when the gates are down, isn't it? Well, in this particular case, the platform itself is demarked by. . . No, no, I know where the platform is. That's not the question I asked you. When those gates are down, passengers can board an eastbound train in Grove Street. The doors won't. That was the evidence, is it? Well, I think the evidence was that passengers debarked from the train there, from a westbound train there. In this case, the eastbound train was traveling with the engine trailing and was going to stop shortly. But the fact of the matter is when those gates are down, you have passengers inside those gates on Grove Street that either get off or get on the train in Grove Street. So Grove Street becomes a portion of your platform, doesn't it? When the gates are down. . . I would say it's part of the platform if the person is intending to board the train at that location. Well, where was Mr. Eskew going? Mr. Eskew was clearly crossing the tracks. Otherwise, he wouldn't have stepped in front of the train. Yeah. And what was he going to do when he got to the other side of the track? Well, he was going to stand on the south platform and board the train. On Grove Street? Well, I don't know whether it was on Grove Street or on the platform itself. It would depend on where the train stopped. But the train, he could have boarded on Grove Street if it had been on the southbound track. I mean, my understanding is that the train would have stopped east of Grove Street and that that's where the shelter and the platform was for boarding. And the limitations on this liability. The point that Mr. Eskew was, we could not exercise the highest duty of care. The Davis case was just a seminal case on the difference between the duty of care owed with respect to the stations and platforms and the passengers. It talks about the rationale for this. And it's because the passengers, when they're on the train or when they're boarding the train or when they're alighting the train, cannot exercise care for their own safety. In this case, Mr. Eskew could exercise care for his own safety. He could decide when to cross the tracks. He could decide where to cross the tracks. And he could decide if to cross the tracks. It's not the type of situation where he is under the care and control of the common carrier and the highest duty should arise. And the example of the unwarranted extension of this is how this highest duty of care was extended to all of the allegations in the plaintiff's complaint, even those pertaining solely to the condition of the stations and the platform. In fact, only two of the allegations in the plaintiff's complaint pertained to the operation of the train. And those allegations were directed only against the NSF. So in this case... Do you read the plaintiff's charge in the allegations as being premises liability allegations? They certainly don't pertain to the operation of the train. How about giving warning to people that the train isn't going to be on that track because you've got speakers that nobody can hear on that side of the track. Is that a premises liability allegation or is that a duty of care? I think that's a premises liability allegation because they were... You and I both know that's true. Now, come on, cut it out. They're talking about we should have had speakers on the north platform. That's a condition of the station. No, they said you should have had some means of notifying people on the north side of the platform that they could hear is what they said. And they exemplified that by bringing in evidence that your speakers are jumbled up funniness when their train's going through. You can't hear them. You can't understand them. And therefore, you did not give notice of this train change. That's not a premises liability allegation. What are their other premises liability allegations? The failure to have additional barriers there. Judge, I'll point to some of these. Failed to place adequate warning signs advising commuters of scheduling changes. Improperly designed and maintained the handicapped access ramp of the platform which allowed for handicapped and blind individuals to proceed onto the platform without receiving warning. What was in the issues instruction? I believe it was taken primarily from the plaintiff's complaint, Your Honor. Not all the allegations in the complaint ended up in the issues instruction, however. That's correct. The barriers certainly were where they were talking about having additional barriers to prevent the people from crossing the street. And what they're talking about at that point is barriers at the crosswalk when we had warning devices there that were approved by the Illinois Commerce Commission. And we were precluded from showing that these warning devices were approved by the Commerce Commission. And we were prevented from offering a conclusive instruction. Those were barriers to prevent people that hadn't already gone beyond those barriers for pedestrian or traffic or vehicle traffic outside of the closed gates. Well, if that allegation is allowed to stand, the Espinoza decision, which says that what the barriers are presumptively adequate when they're approved by the Commerce Commission, mean nothing. That applies to pedestrian gates, too. And Mr. Eskew, at the time he was attempting to cross the tracks, was a pedestrian. He wasn't a passenger. He wasn't about to step on a train. There wasn't a train there sitting and waiting for him with its doors open. He wasn't trying to flag down a train. He doesn't fall within any of the circumstances that the Illinois courts have recognized makes him a passenger owed the highest duty of care, and certainly not owed the highest duty of care with respect to the condition of the platform of the station. A barrier is a premises liability action. A barrier is an ordinary care action. And METRA didn't operate the train, had nothing to do with the operation of the train, and was held to the same standard. At most, METRA had an announcement. But the ticket agent who made the announcement was a DNSF employee. And there was really no basis of liability against METRA. We'll give you a little time on rebuttal. Okay. Thank you. Thank you, Counsel. I gave your opponent 20 minutes. If you need the extra five, you can have it. Thank you, Honor. I hope not to need that. Michael Rasak. I'm here on behalf of the plaintiff's appellees for the family of Scott Eskew. I intend to actually be brief. With respect to the blog issue that Counsel raised, I think we addressed that in our brief. Our primary point was that there was no evidence that there was any external communication with the jury. As the trial judge put it, it was more a way of a diary. It might have been a published diary. Probably better if she didn't do it, but it didn't influence the jurors. And there's no evidence that it influenced the jurors or their deliberations. Unless the court has questions about the blog, I'd like to move to the passenger issue. From what I heard, if I can just clarify one point first, there was no allegation about a sign being on the platform. The allegations of the complaint, I'm sorry, the allegations in the issues instruction do not refer to signs. The question here was basically whether or not Scott was on the platform that morning, because if he is on the platform, according to all the testimony, including the testimony of the ICC expert, he's not within the scope of ICC's control. Everybody agreed that the platform itself is not something that the ICC controls, and that immediately took away all the questions of what external gates they had up to protect people coming onto the platform. And if the court recalls, the testimony was that this was the platform, that they consider anything inside the gates the platform. And in this case, the gates had descended. He'd apparently come into the station. And while he was standing there, because there's no evidence that he walked around the crossing gate, he walked into the station, he walked onto the platform, right next to the tracks, and the gates came down behind him. And once he does that, everybody, the evidence was all that he's on the platform. And once he's on the platform, the railroad controlled his movements. If we need actual control, we have somebody making an announcement, telling the people to cross the tracks. And the court may recall at least two witnesses testified it violates ICC and FCC rules to tell people to make a movement when there are trains going through the station. All I have to do is say that, and I think everybody's radar would go up and say, don't tell people to move when the train is in the station. And that all occurred because the engineer and because the conductor didn't do what she told the station agent she was going to do. If you recall, the conductor said yes to the station agent. We will stop before Grove Street. We won't even get into the station. And that's not what happened. There was some kind of miscommunication there. So the bottom line is we have this individual who, having done this for years, having acted as carefully as he could, waits for this freight train to go past, which takes three or four minutes, it's a mile-long freight, and then is given directions to move across the tracks. He misheard the announcement, but we explained why he misheard the announcement. And once that occurs, we have a situation. They've agreed. I heard him, I heard counsel admit it this morning, and I'm not surprised because it's in page 10 of the reply brief. They've always admitted that Scott was here with the intent to catch this train. The only question is, is the spot where he was standing something that can be considered part of the platform? He had yet arrived at that spot, and all the evidence was that it was. At least it surely sent that question to the jury. And if… Sent the question to the jury? I mean, the duty issue that I already cited. I'm sorry. I'm sorry. To send the case to the jury, the question –  Obviously, it's a question of law. Is he or is he not a passenger? The only case I was going to point to this morning, and I suspect your honors have read it, is the Skelton case. That's the case where the gentleman was waiting for a train on the platform and simply leaned over and fell and was hit by the train. Arguably, if you read the case closely, that was not even a train that was going to stop for him. There was disputed testimony, if you read the facts carefully. The testimony in that case was that train was – Which means it surely was not going to stop there, and the engineer admitted that he had gone through stops previously. And yet they found that that person was a passenger because he was on that platform with the intent to catch a train. In this case, Scott was on the platform with the intent to catch this train. And that makes this a better case than Skelton. It makes it a better case than Katané. It makes it a stronger case than even the Washington case, where they said somebody on the wharf, on the way down to catch a ferry that's 300 or 400 feet away, was still on the platform and in the act of boarding, as that term is used by these people. Well, Skelton, if you assume that where he was standing on Grove Street is part of the platform, Skelton certainly does stand for the proposition that at that juncture they own the highest duty of care. Yes, sir. Because it says that. So the question is, is it really the platform? My main note this morning was, it all comes down to, is where he was the platform? And I think it's unrebutted testimony that the trial judge had before him that it is. As soon as the gates come down, it's part of the platform. And it all sort of makes sense when you realize that the ICC, once those gates are down, is really ceding control. They really expect the railroad to take care of what's going on in the platform. The ICC is not going to tell them what to do with the people inside, and the people inside include Scott. He comes inside the gate. He gets some directions. There's nothing there to tell him. They don't properly tell him what to do, and there's nothing there to control what he did. And we explained what they could have said, and we explained what they could have done, and which the CTA already does to make sure his movements were controlled. Unless the Court has further questions of me, I would rely upon our brief for the remaining points, and obviously we ask for affirmance. What about counsel's suggestion that the trial court should have done some investigation as to the blog, especially since these were comments made to the outside world or the blogger posted this to the outside world, and there were comments, it appears, feedback. There's no evidence of feedback that I'm aware of in this record. I think counsel just admitted if there were comments, he did bring them up. My information, obviously, neither one of us has. The railroad did not bring in that part of the blog they could have, and my understanding is they didn't because there's nothing there. Apparently this blogger did not have much of an audience, and having read it, one might understand why. But there wasn't any evidence to this trial court of some sort of continuing communication between that juror and other people who were telling her what to do. Without that, the judge, I believe, used the term fishing expedition. You could make this comment in any case where you could talk to a juror and the juror would say, well, I told other people about the case, and I would go to court and say, judge, I want you to bring that juror in and tell me if those people she talked to said anything back to her. We could stall every jury verdict because most people on a jury at least say, I'm serving and this is what the case is about. They'd have to investigate everything. I suggest to the court that there should be more than that, and if there was more than that, they could have found it and they did not. My understanding is the burden is very high on a party seeking to challenge the jury's verdict. If the court recalls in the quotient verdict case, even though the jurors admitted that they arrived at a quotient verdict, the court said, no, we're not going to interfere with their verdict, and that's probably the clearest case of juror error I've ever seen, and yet it was affirmed. Again, unless Your Honor has further questions, we will rest on the brief and obviously ask for affirmation. Thank you. Thank you, Your Honor. Very briefly, I want to address a couple of points. First, while the comments themselves are not included, it is clear from the bottom of the blog that starting with her first post, on the day she was selected for jury service at C03165, that there were six comments noted there, and I think if you go to the bottom of the other pages, you note that. We just don't know the content of those comments. The suggestion that we controlled Mr. Eske's movements or his actions at this time is simply not correct. We don't know what he heard or didn't hear, and I believe their expert said that he couldn't say what was in Mr. Eske's mind at the time he started to cross those tracks. But he did start to cross those tracks in the face of an oncoming train with the warning devices working, bells working, lights flashing, gates down, and when he was struck, he was in between two tracks. You can't board a train from in between two tracks. I distinguish this from Skelton, because in Skelton, that was a flag stop, and Mr. Skelton was allowed to go on the platform without a ticket, and I believe some of the testimony is that he was trying to flag the train. And yes, the courts have extended liability to people who are not on the train. They say it's not necessary to be in contact with the train, but only when they're in the act of boarding, riding, or lighting. At the time Mr. Eske was struck, he was in the process of crossing the tracks to get to the other side. He could have been crossing the tracks because he wanted to get on the platform, and we assume that he was, because he typically took that train downtown. But he could have just as easily been crossing the track to get to the other side, been just another pedestrian, and intending to board, and the cases are clear on this, is not enough to make a person a passenger. Did you offer the IPI instruction defining passenger? We offered an IPI instruction on the duty of ordinary care. I think the IPI instruction defining passenger is the one that was submitted by the plaintiff's counsel, because once a person is a passenger, as a matter of law, they're owed the highest duty of care. So they submitted that instruction. The duty of care. The duty of care because he's a passenger, correct. But at that point, the trial court had denied our request, had already determined as a matter of law that Mr. Eske was a passenger, owed the highest duty of care. There was nothing more for us to do at that point. We just couldn't do it. And then the error of all of this is shown by the verdict against METRA. METRA, as named in the complaint, is not even a legal entity. It didn't operate the train. It's a trade name for NARC, which was dismissed on summary judgment. It should never have been in the case, yet a portion of the verdict was allocated to METRA, essentially for the announcements, the condition of the platform, and the lack of barriers, not for the operation of the train. We suggest to the court that this verdict is against well-established law. Clear error below should be reversed and remanded. Thank you, Counsel. Counsel, thank you. The matter will be taken under advisement. The court stands adjourned.